UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| VERA SOHAL | ) | Case No. 05-11350-SSM |
| | ) | Chapter 13 |
| Debtor | ) | |

**MEMORANDUM OPINION**

This matter is before the court on the on the objection of Gerald M. O'Donnell, the standing chapter 13 trustee, to confirmation of the debtor's plan dated March 8, 2005. The heart of the objection is that the debtor – whose schedules disclose no interest in real property – resides in a house which was once titled in her name but is now held in the name of a trust, with the debtor having the right to live rent-free in the property during her lifetime. The question before the court is whether the proposed repayment plan pays creditors at least as much as they would receive in a chapter 7 liquidation. Following a hearing on September 28, 2005, the court took the objection under advisement to review the evidence and the applicable law. For the reasons stated, the trustee's objection to confirmation is sustained.

Background

The debtor, Vera Sohal, is 52 years of age and lives in a single-family house located at 7404 Layton Drive, Springfield, Virginia. She first acquired an interest in the property on September 14, 1987, when she and her then-husband, Kuldip S. Sohal, purchased it as tenants by the entirety with rights of survivorship. (Trustee's Ex. A at 47). She subsequently executed a quitclaim deed on October 19, 1995 to Balram Sandhu, (*Id.* at 45), who was to

hold and administer the property as trustee according to the terms of a land trust agreement dated October 12, 1995. (*Id*. at 24–35).  The named beneficiaries of the land trust were the debtor's son and daughter, Mike Sohal and Pamela Sohal.  (*Id.* at 34).  At the time the quitclaim deed was recorded, there were two outstanding judgments against the debtor totaling approximately $37,388.   Kuldip S. Sohal did not join in the conveyance.[1]

After the debtor and Kuldip S. Sohal were separated (and presumably divorced, although the record is not clear on this point), the debtor deliberately allowed the mortgage to fall into arrears, apparently as a means of extinguishing her husband's interest in the property.  In any event, the property was sold at a foreclosure auction on May 9, 1997, for $120,100.00, to the debtor's son, Mike Sohal, who was eighteen years of age at the time.  (*Id.* at 42–43).[2]  On August 11, 1997, Mike Sohal conveyed the property to Mr. Sandhu who continued to serve as trustee under the land trust agreement.  (*Id.* at 36).  On May 15, 2000, Mr. Sandhu conveyed the property to the debtor who was to serve as trustee under the terms of a revocable trust agreement created by the debtor dated May 11, 2000, which was named

---

[1] The record is unclear as to whether the debtor and Kuldip S. Sohal were still married at the time of the quitclaim deed.  Presumably they were not, since the deed recites her marital status as "unmarried." A divorce, assuming it had occurred, would have transformed the tenancy by the entireties to a tenancy in common.  There is no evidence that Kuldip S. Sohal ever conveyed, or joined in a conveyance, vesting title solely in the debtor.  The court would have to assume, at least on the present limited record, that all that was conveyed by the quitclaim deed was a one-half undivided interest.  The court need not resolve this issue, however, because whatever interest was conveyed by the quitclaim deed was subject to the existing deed of trust and was extinguished when the deed of trust was foreclosed.

[2] According to the debtor, her son borrowed the money to make the purchase.  Since the title report reflects no deeds of trust against the property, the court can only assume that the loan was a private one and is unsecured.  There is no evidence in the record as to if, when, and with what funds the loan was repaid.

the "Vera Sohal Revocable Trust." (Trustee's Ex. B at 1). The named beneficiaries of the trust were Mike and Pamela Sohal. The declaration of trust states, "I reserve the right to revoke or amend this agreement by a writing (other than my will) signed by me and delivered to my Trustee during my lifetime." (*Id.* at Art. V, ¶ G). Several years later the trust was amended to name Mike and Pamela Sohal as trustees, and the debtor conveyed the property to them as trustees of the Vera Sohal Trust, by a deed of gift dated August 26, 2003. (Trustee's Ex. A at 17).[3] The trust amendment provided that the debtor and Kuldip S. Sohal "shall have the right and power to occupy rent free the property ... for their joint life and for the life of the survivor, subject to their paying the real estate taxes, insurance, utilities and ordinary repairs." *Id. at* ¶ I. Slightly less than six months later, Mike and Pamela Sohal conveyed the property to Pamela Sohal (apparently free of any trust) by deed of gift dated February 9, 2004, with the debtor joining in the deed "to release any interest she may have" in the property. A month later, Pamela Sohal conveyed the property by deed of gift dated March 11, 2004, to herself and Mike Sohal as co-trustees of the Pamela Revocable Trust of the same date. (Trustee's Ex. C at 1).

The Pamela Revocable Trust, which is dated March 11, 2004, names Mike and Pamela Sohal as both trustees and beneficiaries. Relevant to the present controversy, it also provides that "[w]hile VERA SOHAL is alive she shall have the right and power to occupy rent free any residence forming a part of the trust assets, subject to her paying the real estate taxes, insurance, utilities and ordinary repairs." (Trustee's Ex. C at 4). The agreement

---

[3] Curiously, the deed describes her as "surviving trustee," although in fact she was the only trustee.

further provides, "During the life of the Trustor, this Trust may be revoked or amended, in whole or in part, by an instrument in writing, delivered to the Trustee [*sic*] and signed by the Trustee or Trustees." *Id*. at 1.

The debtor filed a voluntary petition in this court on April 13, 2005, for adjustment of her debts under chapter 13 of the Bankruptcy Code. On her schedules, she listed liabilities totaling $146,184.61 and assets of $5,010.00. The schedules reflect no interest in real property and no interest in any trust. The plan proposes to pay the trustee $200.00 per month for 60 months for a total plan funding of $12,000. According to the plan, this will provide a dividend to unsecured creditors of approximately seven cents on the dollar.[4]

The chapter 13 trustee filed an objection to confirmation under § 521, Bankruptcy Code, for failure of the debtor to supply copies of the settlement statement (HUD-1 form) from the foreclosure sale of the home and certain records pertaining to the payment of the mortgage. In response, the debtor stated that she was not a participant in the sale, and accordingly does not possess a HUD-1 statement; that she is not a party to the mortgage; and that at one point she was a trustee of a trust which held title to the property.

A hearing was held on September 25, 2005. At the hearing, the trustee, changing course somewhat, argued that debtor had failed to disclose on her schedules that she holds an

---

[4] The claims bar date has now passed, with a total of $69,002.20 in unsecured claims having been filed. (One secured claim was filed in the amount of $8,997.72 by Finance Maryland, LLC, but the creditor subsequently filed an amended proof of claim which apparently "strikes" the original claim. The attachment to the amended claim reflects that the debtor paid the creditor $7,056.00 on June 1, 2005, which was a month and a half after the filing of the chapter 13 petition.) After payment of $1,500 in attorney's fees to the debtor's attorney and the trustee's commission of 10% on funds disbursed, the funds remaining for unsecured creditors would be $9,300, which would provide a dividend of approximately 13.5 cents on the dollar.

interest in real property. The trustee contended that the language contained in the Pamela Revocable Trust, which allows debtor to live on the property rent free for life, constitutes an equitable interest in real property that is analogous to a life estate. Accordingly, the trustee argued, the debtor's plan should not be confirmed because unsecured creditors would receive a greater payout of their claims in a hypothetical chapter 7 case after the trustee sold or otherwise administered the life estate. The debtor rejoined that the trust language was not sufficient to create a life estate, and that even if the equivalent of a life estate interest had been created, it was valueless because the trustees, Pamela and Mike Sohal, could revoke the trust at any time. The debtor testified that her intention in connection with the various transfers was to protect the property for her children, and to "keep a roof over my head" while she was alive.

Conclusions of Law and Discussion

I.

Section 1325 of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 13 plan. Relevant to the present controversy is the requirement that

> the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

§ 1325(a)(4), Bankruptcy Code. This requirement – that unsecured creditors receive payments having a present value at least equal to what they would receive if the debtor's estate were liquidated under chapter 7 – is commonly referred to as the liquidation test or best interest of creditors test. *In re Davis,* 167 B.R. 104 (S.D.Ohio 1994). As noted, the debtor's plan in this

5

case estimates a dividend to unsecured creditors of seven cents on the dollar, although the actual distribution may be closer to 13.5 cents on the dollar. The court must therefore determine whether unsecured creditors would receive more than the present value of that amount in a chapter 7 liquidation.[5] In so doing, the court must look not only at the debtor's property as listed on her schedules, but also consider the recovery of property by the trustee through fraudulent transfer and preference actions. *E.g., In re Larson,* 245 B.R. 609 (D.Minn. 2000).

The trustee's theory is that under the Pamela Revocable Trust the debtor has the equitable equivalent of a life estate. A life estate has an ascertainable value. *See* Va. Code Ann. § 55-269.1 *et seq.* (method and table for valuing life estate).[6] The trustee argues that since the value of the life estate is not being contributed to the plan, creditors are receiving less than they would in a chapter 7 liquidation. This argument is not without considerable force, but nevertheless raises some nettlesome issues. The question is not the value *to the*

---

[5] Because the distribution to unsecured creditors is not being made in a lump sum, but in deferred payments over time, the liquidation test requires that the stream of payments be reduced to present value. The Bankruptcy Code does not specify a particular discount rate, and this court on various occasions has used rates of between 6% and 8%. *See, e.g., In re Gloria Ann Neal*, No. 01-80851-SSM (Bankr. E.D. Va., October 24, 2001) (finding that plan satisfied liquidation test even if 8% discount rate were used). If a discount rate of 6% were applied, $9,300 paid over 36 months would have a present value of $8,491.57, which would equate in this case to a payout of approximately 12 cents on the dollar. For the purpose of the present opinion, however, the court need not select a particular discount rate, because even in the absence of a discount to present value, the plan does not satisfy the liquidation test.

[6] The property is assessed for real estate tax purposes at $331,010. Annual interest on that sum at 8 percent would be $26,480. The present value of an annuity of one dollar for life for a person 52 years of age, as set forth in the annuity table at § 55-269.1, Code of Virginia, is $9.631. That value, multiplied by the annual interest, equals $255,036.58, which is treated as the commuted value of the life estate. Va. Code Ann. § 55-270.

*debtor* of having the right to occupy the property during her lifetime, but what a chapter 7 trustee could *realize* on account of that right. Put another way, could a chapter 7 trustee *sell* the debtor's right under the Pamela Revocable Trust to occupy the property for a term measured by the debtor's life (contingent upon the payment of real estate taxes, insurance, utilities and ordinary repairs)? And assuming the trustee could, what would a purchaser of such a right be likely to pay? A significant issue, certainly, is that because of the family relationship, the debtor's right under the Pamela Revocable Trust to occupy the property rent-free during her lifetime might well be seen as personal to her and hence non-assignable. *But see Tignor v. Parkinson*, 729 F.2d 977 (4th Cir. 1984) (personal injury cause of action that was non-assignable under state law was nevertheless property of the bankruptcy estate).

In any event, the court need not reach the difficult issue of whether a chapter 7 trustee could administer the debtor's right to occupy the property, because it seems clear that the trustee could simply take the more direct route of avoiding the August 23, 2003, transfer from the debtor to her son and daughter as, at the very least, a voluntary conveyance, and more likely one that was made with actual intent to hinder, delay, or defraud creditors. At the time of the conveyance, the debtor held the property as trustee under a revocable trust with respect to which she was the grantor. Although her children are the nominal beneficiaries of the trust, they would not receive any distribution until she died. The debtor retained the power during her lifetime to revoke the trust. Had she exercised that power, she would then have held the property in fee simple. A bankruptcy trustee succeeding to her interest in the property would likewise have had the power to revoke the trust and thereby bring the property into the bankruptcy estate.

Since the transfer of the property from the debtor to her children occurred more than one year prior to the bankruptcy filing, it cannot be avoided under the Bankruptcy Code's own fraudulent conveyance provision. § 548(a)(1), Bankruptcy Code. A chapter 7 trustee, however, may take advantage of state fraudulent conveyance statutes in his capacity either as a hypothetical judgment creditor or as successor to an actual creditor holding an allowed claim. § 544, Bankruptcy Code. Specifically,

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor ... that is voidable by–
> \* \* \*
> (2) a creditor that extends credit to the debtor at the time of the commencement of the case and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists[.]
> \* \* \*
> (b) ...the trustee may avoid an transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

In this connection, two Virginia statutes potentially allow for avoidance of the August 2003 transfer: Section 55-80, Code of Virginia, which allows avoidance of transfers made with actual intent to hinder, delay or defraud creditors,[7] and Section 55-81, which allows

---

[7] Section 55-80, Code of Virginia, provides as follows:

**§ 55-80. Void fraudulent acts; bona fide purchasers not affected**

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors,

(continued...)

8

avoidance of voluntary transfers made if a debtor was insolvent or became insolvent as a result of the transfer.[8]  There is no statute of limitations for an action under § 55-80, and no requirement that the aggrieved creditor's claim predate the transfer.  By contrast, an action under § 55-81 is subject to a five-year statute of limitations and may be maintained only by a creditor whose claim was in existence at the time of the transfer.

The court will first address the fraudulent conveyance statute, § 55-80.  As Judge Bostetter of this court explained in *Bartl v. Garfinkel*, 30 B.R. 199 (E.D.Va. 1983),

> Section 55-80 of the Code declares as fraudulent any transfer of property made with intent to hinder, delay or defraud 'creditors, purchasers or other persons.'  A purchaser for valuable consideration is protected only if he lacks 'notice of the fraudulent intent of his immediate grantor *or of the fraud rendering void the title of such grantor.*'  Va. Code § 55-80 (1981 Repl. Vol).  Actual knowledge of such facts and circumstances as would put a reasonable person on inquiry is sufficient.  *Bank of*

---

[7](...continued)
purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

[8]  Section 55-81, Code of Virginia, provides as follows:

**§ 55-81. Voluntary gifts, etc., void as to prior creditors**

Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made. Even though it is decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers

> *Commerce v. Rosemary & Thyme, Inc.,* 218 Va. 781, 239 S.E.2d 909 (1978).
>
> A claim of fraud must be proved by clear, cogent and convincing evidence. *Schreyer v. Platt,* 134 U.S. 405, 10 S.Ct. 579, 33 L.Ed. 955 (1890); *Land v. Jeffries,* 26 Va. (5 Rand.) 599 (1827; *McClintok v. Royall,* 173 Va. 408, 4 S.E.2d 369 (1939). However, the evidence may be, and generally will be, circumstantial only. *Witz, Biedler & Co. V. Osburn,* 83 Va. 227, 2 S.E. 33 (1883). When the evidence demonstrates a *prima facie* case of fraud, it is then incumbent upon he who would sustain the validity of the transaction to establish its fairness. *Hutcheson v. Savings Bank of Richmond,* 129 Va. 281, 105 S.E. 677 (1921).

20 B.R. at 211–212. Judge Bostetter went on to note that "[i]n the absence of direct and positive testimony, there are many facts and circumstances which the law admits as marks or signs of fraud and from which fraudulent intent may be inferred." *Id.* at 212. These "facts and circumstances" are often referred to as "badges of fraud", and they include: "(1) close relationship of the parties, (2) insolvency of the grantor, (3) pursuit of the grantor by his creditors at the time of the transfer, (4) want or inadequacy of consideration, and (5) retention of possession of the property by the grantor." *Id.* (citation omitted). These "badges of fraud"— and the facts and circumstances surrounding them— vary in their weight and persuasiveness. As the *Garfinkle* court stated, "relationships between the parties, by blood or affinity, calls upon the court for careful examination of the transaction, although the mere relationship itself is not a badge of fraud." *Id.* (citation omitted).

It is not necessary for this court to determine whether a fraudulent transfer actually occurred. It is only necessary that the court determine whether a chapter 7 trustee could *reasonably expect to succeed* in setting aside the transfer. *In re Carter,* 4 B.R. 692, 693 (D. Colo. 1980). In the present case, given the facts and circumstances surrounding the

transfer, the court has little difficulty in concluding that a chapter7 trustee would succeed in proving either that Ms. Sohal made the August 26, 2003, transfer "with intent to hinder, delay or defraud creditors, purchasers or other persons" as proscribed by Virginia law, or that the transfer was made without actual consideration at a time when she was either insolvent or because insolvent because of the transfer.

There is no question that several of the recognized "badges of fraud" are present.[9] For instance, (1) the transfer was to the debtor's children, Mike and Pamela Sohal; (2) at the time of the transfer, five creditors had attained judgments against the debtor;[10] (3) the debtor transferred the property by deed of gift, suggesting that there was a want of consideration; and (4) the debtor retained possession of the property. Furthermore, it appears that Pamela and Mike Sohal would not be able to take advantage of the exception in Section 55-80 for bona fide purchasers because they never provided valuable consideration for the property.

---

[9] Indeed, the trustee might not have to resort to the badges of fraud to prove that the transfer in question was fraudulent. Ms. Sohal admitted in her testimony that in making the transfer, her intention was to protect the property for her children, and to "keep a roof over [her] head" while she was alive. In the very nature of things, an act to "protect" property that would otherwise be available to satisfy creditor claims is an act to hinder those creditors. Put another way, a transfer made with the intent of putting property beyond the reach of creditors cannot be sanitized merely by characterizing it as a transfer to "protect" the property for one's self or one's children.

[10] The following judgments are shown on the title report:

| Date | Docketed | Plaintiff(s) | Amount |
|---|---|---|---|
| 09/21/1995 | 09/21/1995 | Sheikh Irfan Shafique et al | $23,958.34 |
| 08/23/1995 | 11/28/1995 | Irfan Sheikh Shafique et al | $13,430.52 |
| 05/23/1996 | 06/03/1996 | Mohammad Adnan Sheik et al | $14,664.67 |
| 07/01/1996 | 07/29/1996 | Vend Lease Co. | $1,908.24 |
| 11/15/1999 | 11/23/1999 | Jerry's Systems, Inc. | $44,700.48 |
| 02/09/2005 | 03/04/2005 | Prakash Masih | $30,000.00 |

Only the last two of these creditors are listed on the debtor's schedules.

Under the circumstances of this case, therefore, the court finds it likely that a chapter 7 trustee would succeed in setting aside the transfer.

If the trustee did so, he or she could presumably then sell the property for its assessed value of $331,010.  Even assuming costs of sale of 10%, the net available for administration (since the title report shows no deeds of trust) would be $297,909.  This would be more than sufficient (even after deducting the trustee's commission) to pay the $69,002 in filed claims at 100 cents on the dollar.  Since that dividend far exceeds the approximately 13.5% unsecured creditors will receive under the debtor's plan, it is plain that the liquidation test is not satisfied.

A separate order will be entered consistent with this opinion denying confirmation of the debtor's plan.

Date: _____        _____
                                            Stephen S. Mitchell
Alexandria, Virginia                        United States Bankruptcy Judge


Copies to:

Vera Sohal
7404 Layton Dr.
Springfield, VA 22150
Debtor

Gregory H. Counts
Tyler, Bartl, Gorman & Ramsdell, PLC
700 South Washington St. Suite 216
Alexandria, VA 22314-4252

Gerald M. O'Donnell, Esquire
211 North Union St., Suite 240
Alexandria, VA  22314
Chapter 13 trustee